NOT PRECEDENTIAL

IN THE UNITED STATES COURT
OF APPEALS
FOR THE THIRD CIRCUIT

―――――

NO. 06-3982

―――――

UNITED STATES OF AMERICA

v.

ANDRE M. HUGGINS,
                                    Appellant

―――――

On Appeal From the United States
District Court
For the District of Delaware
(D.C. Crim. Action No. 03-cr-00091-1)
District Judge:  Hon. Sue L. Robinson

―――――

Submitted Pursuant to Third Circuit LAR 34.1(a)
February 26, 2010

BEFORE:  CHAGARES, STAPLETON and
LOURIE,*  *Circuit Judges*

(Opinion Filed: August 16, 2010)

―――――

* Hon. Alan D. Lourie, United States Circuit Judge for the Federal Circuit, sitting by
designation.

OPINION OF THE COURT

STAPLETON, Circuit Judge:

Andre Huggins appeals criminal convictions and sentences imposed by the United States District Court for the District of Delaware. For the reasons that follow, we will affirm the judgment of the District Court.

## I. Factual and Procedural Background

This criminal case arose out of a joint investigation conducted by the Internal Revenue Service ("IRS") and the Drug Enforcement Administration ("DEA"). Federal law enforcement officers became interested in Huggins during an investigation into a used car business named 1800 Motor Cars in Wilmington, Delaware. The IRS suspected that 1800 Motor Cars was accepting large cash payments from drug dealers but was not reporting such transactions to the IRS, as required by federal law. Huggins was a client of 1800 Motor Cars, and law enforcement officers believed he was dealing drugs as his primary source of income. As part of the investigation, law enforcement officers used a variety of techniques to investigate Huggins, including surveillance, wiretaps, and a pen register. The agents also conducted undercover operations, using a confidential informant to attempt to purchase drugs from Huggins.

In connection with this investigation, the law enforcement officers sought and received authorization to search Huggins's home for evidence of drug trafficking. At trial, three law enforcement officers testified that Huggins agreed to speak with them while his home was being searched and confessed that he was involved in distributing large amounts of cocaine. Huggins was arrested that day.

A grand jury returned a third superseding indictment, charging Huggins in seventeen counts. Count I charged that Huggins and Ricardo Rogers, a separately indicted co-conspirator, and others engaged in a conspiracy to distribute five kilograms or more of cocaine and distribute fifty grams or more of cocaine base between November 2001 and June 2002, in violation of 21 U.S.C. § 846 and 18 U.S.C. § 2. Counts II through XI charged Huggins and Rogers with distributing cocaine or cocaine base on specific dates between February 21, 2002, and June 4, 2002. Count XII charged that Huggins and Jermaine Franklin, a previously indicted co-conspirator, and others conspired to possess with intent to distribute five kilograms or more of cocaine, in violation of 21 U.S.C. § 846. Count XIII charged Huggins and Franklin with knowingly managing and controlling a building, room, and enclosure for the purpose of unlawfully storing and distributing cocaine, in violation of 21 U.S.C. §§ 856(a)(2) and (b) and 18 U.S.C. § 2. Count XIV alleged that Huggins and Franklin knowingly possessed cocaine with the intent to distribute on May 28, 2003. Lastly, Counts XV through XVII charged Huggins with money laundering, in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i) and 2

involving transactions involving a Cadillac Escalade on December 3, 2001, a GMC Denali on August 14, 2002, and the same GMC Denali on February 3, 2003.

Huggins filed pretrial motions. He moved to dismiss the indictment with prejudice, contending that one of the federal agents involved in the investigation presented materially false information to the grand jury. He also moved to suppress the statements made during the search of his residence, arguing that they were obtained in violation of his *Miranda* rights and were involuntary. The District Court denied the motion to dismiss the indictment without a hearing. The Court also denied the motion to suppress after holding an evidentiary hearing. The case proceeded to trial.

At trial, the government presented the testimony of the three law enforcement officers who interviewed Huggins at his home, Special Agent Greene of the IRS, Special Agent Miller of the DEA, and Task Force Officer Collins[1] of the DEA Task Force. Agent Greene testified that, during the search of the house, the three law enforcement officers spoke with Huggins in his bedroom. During this discussion, Agent Greene explained to Huggins that he had conducted an investigation of his finances and had concluded that his expenditures exceeded the approximately $5,000 of legitimate income reported on his 2001 tax return. Agent Greene then explained to Huggins that, based on the investigation, the officers believed he was making his money by distributing drugs.

---

[1] Task Force Officer Collins testified that he worked as a parole officer for the State of Delaware. During the time relevant to the criminal case, Task Force Officer Collins was assigned to the DEA Task Force.

According to Agent Greene, Huggins initially denied being involved in drug activity but eventually confessed that he was selling powder cocaine. Agent Greene stated that Huggins told them that other individuals, including Ricardo Rogers, Jermaine Franklin, and Ricardo Barnaby, were also involved in selling drugs with him. Specifically, Huggins stated that he sold cocaine to Rogers in four and a half ounce and nine ounce quantities and that Huggins was aware that Rogers converted the powder cocaine into crack cocaine. According to Agent Greene, Huggins also informed them that Franklin held kilograms of cocaine for him and that Franklin held "one to two kilos and up to five kilos" "a couple of times." (App. at 275-76.) Agent Greene also testified that Huggins told the officers he had been purchasing powder cocaine from Barnaby, whom Huggins called Pop or Man-pop, for the previous six months and that he purchased up to ten kilograms of powder cocaine from Barnaby at a time.

The officers also asked Huggins about his involvement with 1800 Motor Cars. Agent Greene said that Huggins told them that he found out about 1800 Motor Cars through an acquaintance. Huggins explained to the officers that he spoke with Chris Malatesta, an employee at 1800 Motor Cars, and told him he needed some cash "cleaned up" and wanted to buy a car. (App. at 290.) According to Huggins, 1800 Motor Cars charged two thousand dollars extra to "clean up" the cash — in other words, to make the transaction appear legitimate and avoid reporting that the business had received over ten thousand dollars in cash. Huggins said he purchased several cars from 1800 Motor Cars, including a 2001 GMC Denali.

5

Agent Greene also testified about his investigation of Huggins's finances. He testified that Huggins lived in a house with a pool in Bear, Delaware, that was purchased for approximately $332,000. He further explained that law enforcement officers discovered a number of expensive items in Huggins's home, including a forty-two inch plasma television, fur coats, and eighty-two sports jerseys. Agent Greene also testified the IRS had no record of tax returns filed by Huggins for the years 1999, 2000, 2002, or 2003, but Huggins did report $5,465 of business income on his 2001 tax return. Agent Greene stated that Huggins explained that he purchased the items in his home with the money he received from selling drugs.

Task Force Officer Collins and Agent Miller also testified at trial and corroborated Agent Greene's statements with regard to Huggins's confession — testifying that Huggins told them that he was involved in dealing cocaine, that he supplied Rogers with cocaine, that Franklin held his drugs for him, and that he purchased drugs from Ricardo Barnaby.

Ricardo Rogers, one of the individuals Huggins identified as involved in distributing drugs with him, also testified for the government at trial. Rogers testified that he sold cocaine and crack cocaine from November 2001 to June 2002 and that Huggins supplied him with the cocaine he sold. Rogers explained that Huggins supplied him with cocaine in four and a half ounce quantities. Rogers also testified that Huggins was aware that he cooked some of the cocaine into crack cocaine and sold it in that form.

6

With regard to the drug transaction alleged in Count II of the Third Superseding Indictment,[2] Rogers testified that he saw Melvin Barner, whom he had met several years earlier, at Huggins's store, Sight and Sound, in February of 2002. Rogers testified that Barner spoke with Huggins in the back of the store and then left the store. After Barner left, Huggins told Rogers that Barner was trying to buy drugs and asked if Rogers "could take care of him." (App. at 1156.) Rogers agreed to supply Barner with the drugs he had asked for and asked Huggins for Barner's phone number. After getting the number from Huggins, Rogers then called Barner, who wanted to buy four and a half ounces of cocaine. He explained to Barner that Huggins told him to "holler" at him, arranged to meet him, and sold him four and a half ounces of cocaine for approximately $3,500 or $3,600. (App. at 1158.) After the first sale, Rogers continued to sell to Barner and testified that he sold drugs to Barner a total of seven times from the first date into the early summer of 2002. In addition to Barner, Rogers said he sold drugs to hundreds of other individuals during that time period and was selling approximately one kilogram of cocaine or crack cocaine per week.

Melvin Barner also testified at trial. He testified that he worked as a paid confidential informant for the DEA in the spring and summer of 2002. Barner testified that on February 19, 2002, he went to Huggins's store to attempt to set up a drug deal with Huggins at the behest of DEA agents. Barner and Huggins exchanged phone

---

[2] Count II charged Huggins and Rogers with knowingly distributing cocaine "[o]n or about February 21, 2002." (App. at 51.)

7

numbers, and Barner asked Huggins where he could buy cocaine. Huggins answered that he could provide it and that he had a friend who was coming in that evening and asked Barner to call him then. Barner then asked how much four and a half ounces of cocaine would cost. Huggins responded that it would cost $3,500. Barner stated that he left with Huggins's number, but that Rogers called him the next day, they set up a drug deal, and completed the deal the following day. Barner also testified that he completed a total of seven drug deals with Rogers in the spring and summer of 2002 and described each of those transactions in detail.

Jermaine Franklin also testified as to his relationship with Huggins at trial. According to Franklin, Huggins offered him approximately $1,000 per week to allow Huggins to use his apartment to "stash" drugs. (App. at 509.) After agreeing to this arrangement in April of 2003, Huggins then began bringing a bag to Franklin's apartment once a week. Franklin would put the bag in his closet, and Huggins would leave. At other times, Huggins would come to Franklin's apartment to retrieve items out of the bag. Franklin testified that Huggins dropped off a bag approximately every week but would come to retrieve items more frequently. Franklin testified that he saw the contents of the bags and believed they contained kilograms of cocaine based on their white color and rectangular shape. He was uncertain about the number of kilograms of cocaine in each bag but believed there was more than one kilogram of cocaine in each bag. Franklin testified that Huggins stopped dropping off drugs in July of 2003. During the period from April to July of 2003, Franklin also testified that he picked up drugs from someone named

Pop, at Huggins's request. Franklin believed that the bags he picked up from Pop contained the same amount of drugs as those Huggins brought to his apartment. Under cross-examination, however, Franklin testified that he was unsure about the exact amount of cocaine in the bags brought to his apartment and had guessed with regard to those amounts.

In addition to the testimony of Franklin, the jury also heard tape recordings of calls between Huggins and Franklin, which Franklin identified as calls in which Huggins would notify Franklin that he was coming to his apartment to pick up drugs from him.

Chris Malatesta, the sales manager at 1800 Motor Cars, testified that he sold five cars to Huggins, including a 2001 GMC Denali ("Denali"). With regard to the Denali, Malatesta said that Huggins wished to purchase the vehicle but told Malatesta to title it in his grandmother's name. Malatesta testified that he and other employees of 1800 Motor Cars falsified numbers on the bill of sale to conceal the fact that Huggins had paid over $10,000 in cash to the dealership so that the business would not have to report the transaction. 1800 Motor Cars also took out a loan in Huggins's grandmother's name for the amount Huggins owed after the cash and a trade-in car were credited toward the sale. A few weeks later, an employee of the bank that provided the loan called Malatesta and expressed concern that Huggins's grandmother had told them she was not aware of the loan that had been taken out in her name. Malatesta testified that he then called Huggins, and Huggins brought him $18,000 in cash to pay off the loan. Malatesta explained that

9

the loan documents showed the entire loan being paid off approximately nine days after it was taken out.

Malatesta testified that Huggins then told him to put his father's name, instead of his grandmother's name, on the title of the Denali. Malatesta then created a false bill of sale that reflected that the Denali was sold to Huggins's father so that the Delaware Division of Motor Vehicles would record the title in Huggins's father's name. Malatesta also testified that the title of the Denali listed Huggins's father as the vehicle's owner.

The testimony of Huggins's grandmother, Ruby Spielman, and his father, Donald Jones, corroborated Malatesta's account of events. Spielman testified that she never authorized 1800 Motor Cars to take out a loan for $18,000 in order to pay for a 2001 Denali and was upset when she found out about the loan. Huggins's father, Donald Jones, testified that Huggins asked him if he could put the Denali in Jones's name, and Jones agreed. Jones also stated that he did not pay any money for the Denali, that it was Huggins's car, that Huggins was the primary driver of the Denali, and that it was kept at Huggins's home.

After the nine day trial, the jury convicted Huggins of six counts: two counts of distribution of cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C) and 18 U.S.C. § 2 (Counts II and XIV); (2) one count of conspiracy to distribute more than five kilograms of cocaine, in violation of 21 U.S.C. § 846 (Count XII); (3) one count of maintaining a dwelling to distribute cocaine, in violation of 21 U.S.C. § 856(a)(2) and (b) and 18 U.S.C. § 2 (Count XIII); and two counts of money laundering, in violation of 18

10

U.S.C. §§ 1956(a)(1)(B) and 2 (Counts XVI and XVII). The jury was unable to reach a verdict on Count I of the third superseding indictment and acquitted Huggins of the remaining ten counts.

Huggins filed a timely motion for judgment of acquittal, seeking acquittal on each of the six counts of conviction. The government also sought forfeiture on Counts II, XII, XVI, and XVII. The parties agreed that the Court would decide the amount of forfeiture and, after holding a hearing on both motions, the Court denied Huggins's motion for acquittal and found that the forfeiture amount was $292,000. Although the total forfeiture amount was $292,000, the money judgment was reduced to $262,000 because the government was able to recover $30,000 from the sale of Huggins's Denali.

Shortly before Huggins was scheduled to be sentenced, his trial counsel withdrew, and he obtained new counsel. The sentencing was rescheduled. On November 4, 2005, Huggins moved for a new trial based on newly discovered evidence. This new evidence included an affidavit from Melvin Barner, the confidential informant, and a private investigator hired by Huggins's family. In the affidavit, Barner allegedly recanted his trial testimony and stated that the government had given him a script before he testified at trial. The investigator reported that Barner had made similar statements to him. In response to this motion, the District Court held an evidentiary hearing. After the hearing and post-hearing briefing, the Court denied the motion for a new trial.

In August of 2006, more than a year and a half after the jury verdict, Huggins filed a *pro se* motion for a new trial, arguing that the government knowingly presented false

evidence at trial, and a second *pro se* motion to vacate the convictions and dismiss the indictment or for a new trial based on the government's failure to disclose exculpatory information in violation of its obligations under Rule 16 and *Brady v. Maryland*, 373 U.S. 83 (1963). At the August 21, 2006, sentencing hearing, the District Court denied those *pro se* motions as untimely.

The Court then sentenced Huggins to 240 months of imprisonment on each of the six counts, ten years of supervised release on three of the counts, and three years of supervised release on the remaining three counts, all to run concurrently. The Court ordered Huggins to pay a special assessment of $600 and entered a final order of forfeiture, awarding the government a $262,000 money judgment. Huggins filed a timely appeal.[3]

## II. Discussion[4]

---

[3] The counsel who assisted Huggins with his motion for a new trial based on newly discovered evidence and at his sentencing hearing was permitted to withdraw from her representation after Huggins was sentenced. This Court appointed the Federal Public Defender for the District of Delaware to represent Huggins on appeal. After his counseled opening brief was filed with the Court, Huggins wrote to the Court, expressing dissatisfaction with his attorneys. Huggins then filed a *pro se* motion, seeking appointment of new counsel or, in the alternative, permission to file a *pro se* supplemental brief. Huggins's motion was denied in accordance with Third Circuit Local Appellate Rule 31.3. His subsequent motion to reconsider was also denied. Huggins then filed another *pro se* motion, asking the Court to suspend Local Appellate Rule 31.3 and allow him to file a *pro se* brief. This motion was referred to a merits panel. This panel granted Huggins's motion and allowed him to file a *pro se* supplemental brief. This opinion addresses the issues raised in Huggins's counseled and *pro se* briefs.

[4] The District Court exercised jurisdiction pursuant to 18 U.S.C. § 3231, and we have jurisdiction pursuant to 18 U.S.C. § 3742(a) and 28 U.S.C. § 1291.

Huggins makes several arguments on appeal. He contends that: (a) the District Court erred by denying his motion to suppress; (b) the evidence was insufficient to support any of the six counts of conviction; (c) the Court erred by denying his motion for a new trial based on newly discovered evidence; (d) the Court erred in calculating his Guidelines range and in determining the forfeiture amount; (e) the Court erred by denying his motion for a new trial based on the government's use of false evidence; and (f) the Court erred by denying his motion to vacate the convictions and dismiss the indictment or, in the alternative, for a new trial based on the government's failure to produce Rule 16 or *Brady* material. He also claims that his convictions should be vacated and the indictment dismissed because of prosecutorial misconduct before the grand jury and asks us to resolve his ineffective assistance of counsel claim on direct appeal. We address each of his arguments in turn.

### A. Motion to Suppress

Before trial, Huggins moved to suppress the statements obtained during the search of his home, arguing that the statements were inadmissible because the officers violated *Miranda v. Arizona*, 384 U.S. 436 (1966), and the statements were involuntary. The Court held an evidentiary hearing and heard testimony from the three officers who interviewed Huggins and Huggins, himself.

The District Court denied the motion, finding that Huggins "was afforded *Miranda* warnings and his statements were voluntary." (Supp. App. at 513.) Specifically, the Court found that Agent Miller advised Huggins of his *Miranda* rights "almost

13

immediately upon the officers' entry" and that Huggins had knowingly signed a written *Miranda* waiver form. *Id.* at 513-14. On appeal, Huggins argues that the District Court erred by finding that he was informed of his *Miranda* rights and that he voluntarily waived those rights. He also claims, for the first time on appeal, that he invoked his right to remain silent by informing the officers that he did not wish to discuss drugs.

We review a district court's denial of a motion to suppress for clear error as to the underlying facts but exercise plenary review over its legal conclusions. *See United States v. Brown*, 595 F.3d 498, 514 (3d Cir. 2010). A suppression argument made for the first time on appeal is waived pursuant to Federal Rule of Criminal Procedure 12 unless good cause is shown. *United States v. Rose*, 538 F.3d 175, 184 (3d Cir. 2008).

*Miranda* requires law enforcement officers to warn suspects of their right to remain silent and their right to an attorney before they may be subjected to a custodial interrogation. *Berghuis v. Thompkins*, 130 S. Ct. 2250, 2259 (2010). "The main purpose of *Miranda* is to ensure that an accused is advised of and understands the right to remain silent and the right to counsel." *Id.* at 2261. Thus, a statement made during a custodial interrogation is "inadmissible at trial unless the prosecution can establish that the accused 'in fact knowingly and voluntarily waived [*Miranda*] rights' when making the statement." *Id.* at 2260 (quoting *North Carolina v. Butler*, 441 U.S. 369, 373 (1979)). The waiver must be (1) "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception" and (2) "made with a full awareness of

14

both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* (internal quotations and citations omitted).

After reviewing the transcript of the evidentiary hearing, we conclude that the District Court did not clearly err by finding that Huggins was properly advised of his *Miranda* rights before he was questioned by the officers. At the evidentiary hearing, Agent Miller testified that, upon entering Huggins's residence, he read the warnings from a standard card issued to DEA agents. Task Force Officer Collins corroborated this testimony. Although Huggins testified that this warning did not occur, the District Court did not clearly err by crediting the testimony of the law enforcement officers instead of that of Huggins.

Second, the Court did not err by concluding that Huggins explicitly waived his rights by knowingly signing the "Miranda Advisement" given to him by Agent Miller. The evidence presented at the hearing did not support a conclusion that the waiver resulted from intimidation, coercion, or deception. The evidence also supports the Court's finding that Huggins signed knowingly.[5] Although Huggins testified that he believed he was signing a consent form regarding his laptop computer, the Court did not

---

[5] Huggins does not contend that he did not understand the meaning of the *Miranda* warnings. In fact, Huggins testified at the evidentiary hearing that he had been arrested previously and been advised of his *Miranda* rights on at least two occasions prior to August 2003. When asked if he understood the significance of *Miranda* rights, he responded, "Yes, I understand *Miranda vs. Arizona*," and stated that he understood what the warnings meant when they were given prior to the questioning in this case. (Supp. App. at 418.)

15

clearly err by not crediting Huggins's testimony, and instead crediting the testimony of the law enforcement officers and recognizing that the form was clear as to its contents.

Finally, Huggins also argues, for the first time on appeal, that he invoked his right to remain silent by informing the agents that he did not wish to speak about drugs. Although we doubt Huggins could succeed on this argument in light of the Supreme Court's recent decision in *Berghuis*, we need not address it because Huggins waived it by failing to raise it before the District Court. *Rose*, 538 F.3d at 184. Moreover, Huggins has not shown good cause for his failure to raise it. Accordingly, we do not address it and conclude that the District Court did not err by denying Huggins's motion to suppress.

### B. Sufficiency of the Evidence

Next, Huggins claims that the evidence was insufficient to support any of the counts of conviction. "When evaluating a sufficiency of the evidence challenge, we must view the evidence in the light most favorable to the government and must sustain the jury's verdict if a reasonable jury believing the government's evidence could find guilt beyond a reasonable doubt." *United States v. Vosburgh*, 602 F.3d 512, 537 (3d Cir. 2010) (internal quotations and citations omitted). Moreover, "[t]he jury is entitled to draw reasonable inferences from the trial evidence." *Id.* "We will overturn a conviction for insufficient evidence only if 'no rational trier of fact could have found [the defendant] guilty beyond a reasonable doubt.'" *United States v. Holmes*, 607 F.3d 332, 335 (3d Cir. 2010) (quoting *United States v. Johnson*, 302 F.3d 139, 149 (3d Cir. 2002)).

### 1. Count II

16

On appeal, Huggins argues that the evidence was insufficient to convict him on Count II because he did not facilitate the February 2002 drug transaction between Barner and Rogers. Count II charged Huggins with knowingly distributing cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C) and 18 U.S.C. § 2, on or about February 21, 2002. At trial, the jury was instructed as to principal and aider and abettor liability for Count II.

The evidence at trial, when viewed in the light most favorable to the government, was sufficient to allow a jury to conclude that Huggins knowingly distributed cocaine or aided and abetted the distribution of cocaine as alleged. First, Barner testified that he visited Huggins in his store on February 19, 2002, that they exchanged phone numbers, and that he asked Huggins how he could obtain cocaine. Barner testified that Huggins responded that he had a friend who was coming who could provide it and also quoted a price for four and a half ounces of cocaine. Barner further testified that Rogers called him the next day, they arranged for Barner to purchase four and a half ounces of cocaine at the price Huggins quoted, and that he did in fact purchase that amount of cocaine from Rogers on February 21, 2002. Second, Rogers testified that Huggins asked him if he could provide Barner with the cocaine he was seeking. Rogers agreed to do so and sold four and a half ounces of cocaine to Barner. Finally, Agent Greene, Agent Miller, and Task Force Officer Collins testified that Huggins admitted to selling cocaine to Rogers on several occasions when he spoke with agents at his home. This evidence was sufficient to

17

support the jury's verdict that Huggins knowingly distributed cocaine or aided or abetted the distribution of cocaine on February 21, 2002.[6]

## 2. Counts XII, XIII, and XIV

Count XII charged that, from on or about April 28, 2003, to on or about July 11, 2003, Huggins and Jermaine Franklin and others knowingly conspired to possess with the intent to distribute five kilograms or more of cocaine, in violation of 21 U.S.C. § 846. Count XIII charged that Huggins and Franklin knowingly managed a building, room, and enclosure for the purpose of unlawfully storing and distributing cocaine, in violation of 21 U.S.C. §§ 856(a)(2) and (b) and 18 U.S.C. § 2. Count XIV charged that, on or about

---

[6] Huggins contends that Agent Ramos-Diaz's trial testimony and Agent Miller's notes require us to conclude that Rogers was not present in Huggins's store on February 19, 2002, and thus there is insufficient evidence to support the jury's verdict that Huggins aided and abetted the distribution of cocaine to Barner. We conclude to the contrary. At trial, Rogers testified that he was inside of Huggins's store when Barner came in and spoke with Huggins. Barner, on the other hand, testified that Rogers was on his way into Huggins's store as he was exiting it. Consistent with Barner's testimony, Agent Ramos-Diaz testified, and Agent Miller's notes confirmed, that Agent Ramos-Diaz saw Barner meet and speak with Rogers outside of the store. Although Huggins has identified inconsistencies among the trial testimony of Rogers, Barner, and Agent Ramos-Diaz with regard to whether Rogers was inside of Huggins's store while Huggins was speaking with Barner, this does not establish that Rogers did not enter the store and speak with Huggins about selling cocaine to Barner on February 19, 2002. In fact, the testimony of Barner and Agent Ramos-Diaz support an inference that Rogers was headed into Huggins's store after speaking with Barner. The jury, as the finder of fact, was entitled to draw such an inference or to credit the testimony of Rogers. Accordingly, the evidence, when viewed in the light most favorable to the government, was sufficient to support the jury's verdict, and these inconsistencies do not give us reason to overturn it.

18

May 28, 2003, Huggins and Franklin knowingly possessed with intent to distribute cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C) and 18 U.S.C. § 2.

On appeal, Huggins makes three arguments with regard to these convictions. First, with regard to all three counts, he contends that there is no direct evidence that what he possessed was cocaine. With regard to Count XII, he also argues that the evidence did not support a conclusion that the conspiracy involved five or more kilograms of cocaine and that the evidence did not show an agreement between two or more persons.

First, the government was not required to produce direct evidence that Huggins possessed cocaine during the conspiracy. Contrary to Huggins's argument that the government was required to produce a chemical analysis to prove he conspired to distribute cocaine, the government may prove the identity of a controlled substance through circumstantial evidence. *See, e.g.*, *Griffin v. Spratt*, 969 F.2d 16, 22 n.2 (3d Cir. 1992). Here, there was sufficient circumstantial evidence for the jury to conclude that Huggins and Franklin were distributing cocaine. Significantly, three law enforcement officers testified that Huggins told them he was selling powder cocaine and that Franklin held his "stash" for him. In addition, Franklin testified that he had seen the contents of the bags Huggins brought to his apartment and that he believed the bags contained kilograms of cocaine because of their white color and rectangular shape. Thus, the evidence was sufficient to support the jury's determination that Huggins was involved in a conspiracy to distribute cocaine with Franklin.

19

With regard to Count XII, the evidence was clearly sufficient to support the jury's finding that Huggins and Franklin agreed to possess cocaine with the intent to distribute and that their agreement involved more than five kilograms of cocaine. The jury heard testimony from the three law enforcement officers who interviewed Huggins at his home, and they testified that Huggins told them that Franklin held drugs for him at his apartment. The officers also testified that Huggins made comments about the quantity of drugs that Franklin held for him, and the jury could infer from this testimony that the conspiracy involved a total of more than five kilograms of cocaine. (App. at 275 ("He [Huggins] said he [Franklin] was holding one to two kilos and up to five kilos."); 1585 ("He [Huggins] said that he [Franklin] holds one or two kilos, but less than five on a couple of occasions."); 1713 ("Mr. Huggins stated that Jermaine Franklin has held one to two kilograms of cocaine, but less than five kilograms of cocaine a couple of times for Mr. Huggins.")). Agent Greene also testified that Huggins said he purchased up to ten kilograms from Barnaby at one time.

Franklin testified at trial that he agreed to hold Huggins's drugs at his apartment in exchange for $1,000 a week and that Huggins would frequently bring over bags that contained packages of drugs. Although Franklin testified that he was not certain about the amount of cocaine in each bag, he stated that each bag appeared to have more than one kilogram of cocaine in it and that Huggins came by once a week between April and July of 2003 to drop off a bag of cocaine. Thus, there was sufficient evidence from which a jury could conclude that the conspiracy involved more than five kilograms of cocaine

20

and that Huggins and Franklin formed an agreement in which Huggins paid Franklin to store his drugs.

### 3. Counts XVI and XVII

We also conclude that the evidence was sufficient to support the jury's verdict as to the money laundering counts. In order to obtain convictions on Counts XVI and XVII, the government was required to prove: "(1) an actual or attempted transaction; (2) involving proceeds of specified unlawful activity; (3) knowledge that the transaction involves the proceeds of some unlawful activity; and (4) . . . knowledge that the transactions were designed in whole or in part to conceal the nature, location, source, ownership, or control of the proceeds of specified unlawful activity." *United States v. Omoruyi*, 260 F.3d 291, 294-95 (3d Cir. 2001). Count XVI alleged an August 14, 2002, transaction involving the 2001 GMC Denali, and Count XVII alleged a February 3, 2003, transaction involving the same vehicle.

On appeal, Huggins first argues that the evidence did not establish that the money used for the two transactions was the proceeds of specified unlawful activity. Contrary to Huggins's argument, the evidence was sufficient to support the jury's conclusion that the money used in the transactions was the proceeds of specified unlawful activity, namely violations of 21 U.S.C. §§ 841 and 846. First, Agent Greene testified that Huggins told him during the interview that he spoke with an employee at 1800 Motor Cars and told him that he "had some cash that he needed cleaned up and he wanted to get a car." (App. at 290.) The jury also heard evidence that Huggins was involved in distributing cocaine and

21

that his expenses greatly exceeded his reported income, and thus it could have reasonably inferred that income from the drug transactions was used to purchase the car.

Second, Huggins claims that the evidence was insufficient to support a finding that he knew the transactions were designed to conceal the nature, location, source, ownership, or control of the proceeds used to purchase the vehicles. This argument also fails. Significantly, as mentioned above, Agent Greene testified that Huggins said he told the employee of 1800 Motor Cars, Malatesta, that he needed money "cleaned up" and that 1800 Motor Cars charged an additional $2,000 for this service. Second, Malatesta testified at trial that 1800 Motor Cars falsified the bill of sale for the Denali in order to conceal the fact that Huggins had paid over $10,000 in cash for the vehicle. Third, the jury also heard from Malatesta that Huggins directed 1800 Motor Cars not to put the title of the Denali in his name and, instead, to title it in grandmother's name, and then, after she found out and objected, to place it in his father's name. Further, Huggins's father testified that he authorized his son to put the Denali in his name, but that it was Huggins's car, that he did not make payments on it, and that he did not regularly drive it. After hearing this evidence, the jury could reasonably conclude that Huggins knew the transactions were designed to conceal the nature of the proceeds used to purchase the vehicles.[7]

_____

[7] Huggins's reliance on *United States v. Sanders*, 928 F.2d 940 (10th Cir. 1991), is misplaced because the facts of that case were materially different. There, the defendant was convicted of two counts of money laundering based on two vehicle purchases. The Tenth Circuit found that the evidence was not sufficient to support the money laundering

## C. Sentencing Issues

### 1. Sentencing Enhancement

Next, Huggins contends that the District Court abused its discretion during sentencing by increasing his offense level by two levels for his leadership role in the offense, arguing that there was no evidence to support a finding that he was a leader of five or more people. *See United States v. Tomko*, 562 F.3d 558, 567 (3d Cir. 2009) (en banc) (recognizing that we review the sentence imposed by a district court under the abuse of discretion standard). This argument is without merit because the District Court did not sentence him based on a determination that he was a leader of five or more people. Sections 3B1.1(a) and 3B1.1(b) of the Sentencing Guidelines address criminal activity that "involved five or more participants or was otherwise extensive" and direct the Court to increase the offense level by four and three levels, respectively, upon a finding that the defendant engaged in such criminal activity. Huggins, however, was sentenced pursuant to § 3B1.1(c) which directs the Court to increase the offense level by two levels "[i]f the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b) . . . ." U.S. Sentencing Guidelines

---

convictions because there was no indication that the purchases at issue were intended to conceal drug proceeds. Specifically, the Court noted that the two vehicles were purchased for the defendant's wife and daughter, and one of the vehicles was titled in his daughter's name, but that the defendant's ownership of the vehicle was apparent, and there was no evidence of an attempt "to conceal or disguise the source or nature of the proceeds." *Id*. at 946. The evidence in this case — unlike in *Sanders* — clearly showed that the transactions were intended to conceal Huggins's ownership of the vehicles.

Manual § 3B1.1(c) (2005). Huggins was sentenced in accordance with § 3B1.1(c), and his offense level was increased by two levels.

To the extent Huggins argues that he was not a leader of the criminal activity, this argument is easily rejected because there was ample support for the District Court's determination that a two level increase, as recommended by the Presentence Investigation Report, was appropriate because Huggins was an organizer or manager of the drug activity he engaged in.[8] Accordingly, we find no abuse of discretion. We also note that, although the District Court calculated Huggins's Guidelines range as 188 to 235 months, the Court was required to impose a mandatory minimum of 240 months on Count XII, and imposed that sentence of imprisonment for each of the six counts of conviction. Thus, if there were error in calculating the Guidelines range, it was certainly harmless. *See United States v. Langford*, 516 F.3d 205, 215 (3d Cir. 2008) (holding that an incorrect Guidelines calculation generally requires a remand for resentencing "unless [we] conclude on the record as a whole . . . that the error did not affect the district court's selection of the sentence imposed." (citation omitted)).

### 2. Forfeiture Amount

Huggins also claims that the District Court erred in calculating the forfeiture amount. "We review a district court's factual findings for clear error and exercise plenary

---

[8] The recommendation in the Presentence Investigation Report was based on Franklin's testimony that Huggins had recruited and paid him to store drugs at his apartment and on Huggins's statements to law enforcement authorities, in which he explained that Franklin held drugs for him.

review over a district court's interpretation of a statute." *See United States v. Cheeseman*, 600 F.3d 270, 275 n.4 (3d Cir. 2010). Federal Rule of Criminal Procedure 32.2 provides that "after a verdict or finding of guilty . . . on any count in an indictment . . . regarding which criminal forfeiture is sought, the court must determine what property is subject to forfeiture under the applicable statute." Further, "[i]f the government seeks a personal money judgment, the court must determine the amount of money that the defendant will be ordered to pay." Fed. R. Crim. P. 32.2(b)(1). Here, the government sought forfeiture on Counts II and XII under 21 U.S.C. § 853(a) and on Counts XVI and XVII under 18 U.S.C. § 982(a)(1). The parties agreed that the Court would determine the forfeiture amount, and the Court held an evidentiary hearing on the matter. After the hearing, the Court issued a Preliminary Order of Forfeiture and an accompanying memorandum opinion in which it concluded that the government had proven, by a preponderance of the evidence, that the amount of proceeds associated with Count II was $3,500 and with Count XII was $250,000. The Court also found that the value of the property involved in Counts XVI and XVII was $38,500 but noted that the government had recovered $30,000 from the sale of the Denali. Thus, the total amount in the Preliminary Order of Forfeiture was $262,000.

Huggins argues that the District Court erred in determining the forfeiture amount.[9] First, he argues that the Court erred by attributing the total amount of the proceeds involved in Count II to him, even though there was no evidence that he received all of the money. This argument fails because 21 U.S.C. § 853(a)(1) "imposes joint and several liability with respect to forfeiture." *See United States v. Pitt*, 193 F.3d 751, 765 (3d Cir. 1999). Thus, Huggins is responsible for the entire amount involved in Count II.

Second, Huggins argues that the Court erred by concluding that Count XII involved ten kilograms of cocaine and that the value of a kilogram of cocaine was $25,000. We find no error. First, the law enforcement officers' testimony regarding Huggins's statements about the amount of drugs he held at Franklin's apartment and obtained from Ricardo Barnaby was sufficient to support a finding that ten kilograms were involved in the conspiracy alleged in Count XII. Second, Agent Miller's testimony was sufficient to establish the price for one kilogram of cocaine in Wilmington, Delaware, at the time of the conspiracy was approximately $25,000. Accordingly, the Court did not clearly err by arriving at a forfeiture amount of $250,000 for Count XII.

Third, Huggins argues that it was improper for the Court to require him to forfeit $38,500 as the value of property involved in Counts XVI and XVII. We find no clear error in the Court's determination of the value of the Denali. We also note that Huggins

---

[9] Huggins's argument that *United States v. Booker*, 543 U.S. 220 (2005), applies to the forfeiture amount, is foreclosed by our decision in *United States v. Leahy*, 438 F.3d 328, 331-32 (3d Cir. 2006) (en banc).

is mistaken when he claims that the government both retained the vehicle and sought a money judgment for the value of the vehicle. The government did seize the vehicle, but when it was sold, the $30,000 sale amount was used to reduce the amount owed by Huggins to $8,500.

The remainder of Huggins's arguments regarding the forfeiture are without merit.

### D. Motion for a New Trial Based on Newly Discovered Evidence

As discussed above, after trial, Huggins filed a counseled motion for a new trial based on newly discovered evidence pursuant to Federal Rule of Criminal Procedure 33, relying primarily on an affidavit purportedly signed by Melvin Barner, the confidential informant who testified on behalf of the government at trial, and a private investigator's report. In the affidavit ("Affidavit 1"), Barner averred that he had testified falsely at trial when he described Huggins's role in the drug transaction between Barner and Rogers and that the government gave Barner a script to memorize for trial.[10] Huggins argued that this newly discovered evidence required a new trial because the jury might have reached a different conclusion if it had been presented with this evidence. In response to the motion, the government produced a second affidavit from Barner. In this affidavit, Barner averred that he "did not write or authorize the text of [the first affidavit], and . . . did not knowingly sign it." (App. at 2073.) He also stated that he testified truthfully at trial and was not given a script to memorize by the government.

---

[10] Barner's testimony was used in support of Huggins's conviction on Count II of the Third Superseding Indictment.

The District Court scheduled an evidentiary hearing on Huggins's motion for a new trial. At the hearing, Barner testified that he did not sign Affidavit 1 as written and that the statements in it were not true. Instead, he explained that he was incarcerated at the same institution as Huggins and that Huggins had managed to contact him — personally and through others — several times about his trial testimony. During one such contact with Huggins, Barner said that he signed a blank sheet of paper but never signed a completed affidavit or Affidavit 1. Barner also testified that his trial testimony was truthful and that he was not given a script to memorize at trial. Huggins offered contradictory testimony, stating that Barner had in fact signed Affidavit 1 as written.

After the hearing, the District Court denied Huggins's motion for a new trial. The Court found Barner credible and accepted his testimony that he had testified "truthfully and to the best of his recollection" at trial and had not been given a script to memorize. (App. at 71.) The Court also found it plausible that Barner would sign the blank sheet because he was "uncomfortable" about being incarcerated at the same institution as Huggins and had been contacted on several occasions by Huggins or other inmates. *Id.* Thus, the Court determined that "any statements or conduct Barner made while incarcerated with defendant are suspect and less believable than his testimony given under oath and in open court." (App. at 72.) Because the District Court found that "Barner's testimony persuasively repudiated the allegations in Affidavit 1," the Court determined that there was "no newly discovered evidence to consider as grounds for a new trial." *Id.*

28

On appeal, Huggins argues that the Court abused its discretion by denying his motion for a new trial, contending that he met each of the five factors first set forth in *United States v. Ianelli*, 528 F.2d 1290 (3d Cir. 1976). He also claims that the Court erred by limiting the scope of the evidentiary hearing and refusing to allow Huggins to question Barner about the truth of his statements at trial. Finally, he argues that the Court erred by refusing to hold an additional hearing to allow his family's private investigator to testify.

We have held that a district court may grant a new trial based on newly discovered evidence if the following five requirements are met: "(a) the evidence must be in fact, newly discovered, i.e., discovered since trial; (b) facts must be alleged from which the court may infer diligence on the part of the movant; (c) the evidence relied on, must not be merely cumulative or impeaching; (d) it must be material to the issues involved; and (e) it must be such, and of such nature, as that, on a new trial, the newly discovered evidence would probably produce an acquittal." *See United States v. Brown*, 595 F.3d 498, 511 (3d Cir. 2010) (citing *United States v. Cimera*, 459 F.3d 452, 458 (3d Cir. 2006) (quoting *Ianelli*, 528 F.2d at 1292)). A defendant "bears a 'heavy burden' in proving each of these requirements." *Id.* Moreover, "courts . . . look upon after-discovered evidence or recantations with skepticism and do not generally grant new trials on such grounds." *United States v. Meyers*, 484 F.2d 113, 116 (3d Cir. 1973). We review a district court's decision to deny a motion for a new trial for abuse of discretion. *Brown*, 595 F.3d at 511.

29

Here, the District Court did not abuse its discretion by denying Huggins's motion for a new trial based on its finding that "there [was] no newly discovered evidence to consider as grounds for a new trial." (App. at 72.) This finding was based on the Court's finding that Barner's alleged recantation was falsified and that he had signed a blank sheet of paper, not Affidavit 1. We find no clear error in this determination, as the Court determined that Barner was a credible witness at the evidentiary hearing and accepted that he testified truthfully or "to the best of his recollection" at trial. (App. at 71.) Given these findings, the Court did not abuse its discretion by concluding that Huggins had not presented newly discovered evidence that would merit granting his motion for a new trial.

Huggins also argues that the Court erred by limiting the scope of the evidentiary hearing to whether Barner actually signed Affidavit 1 and "did not consider evidence of whether Mr. Barner's trial testimony was actually false." (Appellant's Br. 44.) At the hearing, the issue before the Court was whether Huggins had discovered new evidence that required a new trial. During cross-examination, Huggins's counsel attempted to question Barner about what actually occurred in February of 2002, and the government objected. The Court sustained the government's objection, explaining that it was first interested in determining whether Affidavit 1 was Barner's affidavit and whether Barner had testified pursuant to a script at trial.

The District Court did not err by proceeding in this manner. In order to grant the motion for a new trial, the Court was first required to find that the defendant had presented newly discovered evidence. *See Brown*, 595 F.3d at 511. The evidence

Huggins submitted in support of his motion included Affidavit 1 and the investigator's report about the statements Barner made. In order to determine whether this was newly discovered evidence, the Court was appropriately concerned with whether the evidence was genuine — specifically, whether Barner was indeed asserting that he had not testified truthfully at trial or had been given a script to memorize for trial. As the District Court put it at the hearing, "[w]ithout newly discovered evidence, we wouldn't be here." (Hr'g Tr. 67, Mar. 2, 2006.) Given that the authenticity of this evidence was contested, it was proper to address that issue first. Accordingly, the Court did not err by first focusing the hearing on whether the evidence of Barner's recantation was falsified.[11]

Neither did the Court err by refusing to hold an additional hearing to allow Huggins to present the testimony of the private investigator. As we have noted, Huggins's November 4, 2005, motion for a new trial based on newly discovered evidence was accompanied by a copy of a private investigator's report which represented that Barner had recanted his trial testimony in a prison interview. On February 9, 2006, the District Court scheduled an evidentiary hearing on Huggins's motion for March 2, 2006. Two days before the scheduled hearing, Huggins moved for a continuance on the ground that the private investigator could not appear at the hearing because of a doctor's

_____

[11] To hold otherwise would give defendants an incentive to falsify evidence of recantations by government witnesses. In a case such as this, if the Court did not first determine whether the recantation was falsified, the evidentiary hearing would give the defendant the opportunity to question the witness again and possibly create new evidence, even when there was no genuine evidence to support the defendant's motion.

appointment. The District Court denied the motion, noting that it was fourteen months since the return of the verdict and Huggins had yet to be sentenced. It ruled, however, that while the hearing would go forward as scheduled the Court would consider reopening the record in the light of the evidence received at the hearing and the post-hearing briefing.

In its post-hearing opinion, the District Court evidenced its awareness of the contents of the private investigator's report by quoting it at length. It ruled, however, that "[c]onsidering the conclusions reached regarding Barner and Affidavit 1, it [would be] unnecessary" to reopen the record. (App. at 74.) It did not abuse its discretion in so ruling. The Court had heard Barner and Huggins testify, had become familiar with the situation Barner faced in prison, had become convinced that Barner had not recanted, and had concluded that any statements Barner made while incarcerated with Huggins which were inconsistent with his trial testimony should not be credited. The Court was the trier of the relevant facts under these circumstances and was in a position to know whether the private investigator's report could affect its decision on Huggins's motion. Under these circumstances, the District Court did not abuse its discretion in concluding that a reopening of the record would not be helpful.[12]

_____

[12] In his *pro se* supplemental brief, Huggins argues that the N-15 CD, a recording taken from a wire worn by Barner on February 19, 2002, Agent Ramos's trial testimony, and Agent Miller's notes also support his motion for a new trial. However, this evidence was not newly discovered, as it was all disclosed to Huggins's counsel before or during trial.

Accordingly, we find no error in the District Court's denial of Huggins's motion for a new trial based on newly discovered evidence.[13]

### E. Motion for a New Trial Based on the Allegation that the Government Used Perjured Testimony of Barner and Rogers

Huggins argues that the District Court abused its discretion by denying his motion for a new trial based on the prosecution's use of perjured testimony. Here, Huggins claims that Barner's and Rogers's testimony about his role in their drug transaction was false. Huggins contends that he did not connect Barner and Rogers by giving Roger Barner's phone number, but, instead, that Barner and Roger met outside his store and completed their transaction without Huggins's assistance.

The District Court denied this motion for a new trial as untimely. We find no error. The jury verdict was entered in January of 2005, but Huggins did not file the motion until August of 2006. When Huggins filed his motion, Rule 33 of the Federal

---

[13] Huggins asks us to resolve the question of whether the test set forth in *Larrison v. United States*, 24 F.2d 82 (7th Cir. 1928), applies to his case. In *Larrison*, the Seventh Circuit held that a defendant was entitled to a new trial upon a showing that "(1) the witness is material and the testimony false; (2) the jury *might* have reached a different verdict if it knew the testimony was false or if it hadn't heard the testimony; and (3) the defense was taken by surprise by the false testimony or didn't learn of its falsity until after trial." *United States v. Mitrione*, 357 F.3d 712, 717 (7th Cir. 2004) (emphasis in original). That Court has subsequently overruled the test set forth in *Larrison*. *Id.*

We have not yet adopted the *Larrison* test and find no occasion to resolve the question of whether it would apply in this case. Even if we did apply it, Huggins would not be entitled to a new trial because he could not satisfy its third prong. Although he asserts in his opening brief that he did not know Barner's trial testimony was false until after the trial, this claim is implausible because he was a party to the conversation Barner testified about and, therefore, Huggins knew whether Barner was accurately describing its contents and his role in the transaction between Barner and Rogers.

Rules of Criminal Procedure required that any motion for a new trial to be "filed within 7 days after the verdict," unless the motion was based on newly discovered evidence or the Court had extended the time to file within the 7 days allowed by the Rule. Fed. R. Crim. P. 33(b). The motion regarding the testimony of Barner and Rogers was not based on newly discovered evidence, as all of the evidence relied on was introduced at trial or disclosed before trial. Nor did the District Court extend the time for filing the motion to August of 2006. Accordingly, Huggins's motion for a new trial based on the false testimony of Barner and Roger was untimely and was properly denied as such. *See Eberhart v. United States*, 546 U.S. 12, 19 (2005) ("Rule 33 . . . is a claim-processing rule-one that is admittedly inflexible because of Rule 45(b)'s insistent demand for a definite end to proceedings.").

*F. Motion to Vacate Convictions and Dismiss the Indictment or for a New Trial Based on the Government's Failure to Disclose Rule 16 &* Brady *Material*

Next, Huggins argues that the District Court erred by denying his motion to vacate his convictions and dismiss the indictment or, in the alternative, for a new trial based on the government's failure to disclose exculpatory evidence in violation of Rule 16 and *Brady*. Huggins claims that the government should have informed him that Jermaine Franklin was guessing about the amounts of cocaine and money Huggins brought to his apartment. The District Court denied Huggins's motion as untimely. As Huggins's motion was filed more than a year after the jury verdict and was not based on newly

34

discovered evidence, it was properly denied as untimely under both Rule 29 and Rule 33 of the Federal Rules of Criminal Procedure. *See* Fed. R. Crim. P. 29; Fed. R. Crim. P. 33.

Moreover, even if we assume *arguendo* that a discovery violation did occur, Huggins's claim would fail because he cannot show prejudice: Huggins wrote a letter to the District Court on May 16, 2005, acknowledging that he and his attorneys knew Franklin was guessing about the amounts before the trial, and, at trial, his counsel was in fact able to elicit that information from Franklin during cross-examination. *See Strickler v. Greene*, 527 U.S. 263, 281-82 (1999) ("There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused . . .; that evidence must have been suppressed by the [government] . . . ; and prejudice must have ensued."); *see also Lambert v. Blackwell*, 387 F.3d 210, 265 (3d Cir. 2004) ("*Brady* does not require the government to inform a defendant about information that the defendant possesses."). Accordingly, the District Court did not err by denying this motion.

### G. Prosecutorial Misconduct Before the Grand Jury

Next, Huggins contends that his due process rights were violated when the government knowingly presented false testimony to the grand jury and asks the Court to vacate the convictions and dismiss the indictment. Specifically, Huggins claims that Rogers and Franklin gave false or misleading testimony before the grand jury. We do not address the merits of this claim because it was waived when Huggins failed to raise it before the District Court, and Huggins has not shown good cause for his failure to raise it. *See* Fed. R. Crim. P. 12; *United States v. Whitfield*, 590 F.3d 325, 359 (5th Cir. 2009); *cf.*

35

*Rose*, 538 F.3d at 183-84. Although Huggins did file a motion to dismiss the indictment based on material misrepresentations to the grand jury before the District Court, that motion was focused solely on the testimony of Agent Miller. Furthermore, even if we assume *arguendo* that the government did engage in misconduct before the grand jury, the "petit jury's guilty verdict rendered any prosecutorial misconduct . . . harmless." *See United States v. Console*, 13 F.3d 641, 672 (3d Cir. 1993) (citing *United States v. Mechanik*, 475 U.S. 66, 70-72 (1986)).

## I. Ineffective Assistance of Counsel Claim on Direct Appeal

Huggins argues that this Court should consider his ineffective assistance of counsel claim on direct appeal. This Court generally refuses to hear such claims on direct appeal, except in the rare case in which the claim does not require an evidentiary hearing to further develop the facts. *See United States v. Headley*, 923 F.2d 1079, 1083 (3d Cir. 1991). Here, Huggins claims that his trial counsel was constitutionally deficient because counsel failed to introduce the N15 CD, the recording taken from the wire Barner wore on February 19, 2002, into evidence and failed to impeach Barner with the CD or the testimony of Agent Ramos. In order to succeed on this claim, Huggins must show that: (1) "counsel's representation fell below an objective standard of reasonableness" and (2) "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984). Huggins's trial counsel may well have made a strategic choice not to use the N15 CD and Agent Ramos's testimony to impeach Barner. It is far from clear that this evidence could have been

36

effectively used to impeach Barner[14] and several other approaches were available to trial counsel. In fact, trial counsel attacked Barner's credibility on several other grounds — questioning him about his engagement in criminal activity while he was working as a confidential informant for the government and his history of violating court orders and lying to law enforcement officers. Counsel also questioned Barner about his plea agreement with the government.

Because the record must be further developed, this is not the rare case in which we may resolve an ineffective assistance claim on direct appeal. Accordingly, we do not reach this claim.

### III. Conclusion

We have considered all of Huggins's remaining arguments and have determined that they are without merit. Accordingly, the judgment of the District Court will be affirmed.

---

[14] As the District Court observed, "[a]fter listening to N15 multiple times in tape and CD form, it remains difficult to discern the identities of the speakers, the contents of their conversations, or the location of same." (App. at 72.)